PER CURIAM.
¶ 1 Barbara and Jeremy Engelking appeal a judgment dismissing their claims against Enbridge (U.S.), Inc., Enbridge Energy, LP, and Enbridge Pipelines, (Southern Lights), LLC (collectively, Enbridge). The circuit court concluded that some of the Engelkings' claims were barred by the doctrine of claim preclusion, and it later determined Enbridge was entitled to summary judgment on the Engelkings' remaining claims. We conclude the court properly dismissed all of the Engelkings' claims against Enbridge. We therefore affirm.
BACKGROUND
¶ 2 This appeal involves a dispute regarding pipelines owned by Enbridge that traverse property owned by the Engelkings. The parties' dispute regarding the pipelines has been before us on two previous occasions. See Enbridge Energy, Ltd. P'ship v. Engelking , No. 2012AP1188, unpublished slip op. (WI App Mar. 12, 2013) (Enbridge I ); Enbridge Energy, Ltd. P'ship v. Engelking , No. 2015AP1346, unpublished slip op. (WI App Oct. 25, 2016) (Enbridge II ). In summarizing the relevant factual and procedural background, we rely, in part, on our previous opinions in Enbridge I and Enbridge II .
¶ 3 The Engelkings own a twenty-acre parcel of land in Douglas County. Enbridge I , No. 2012AP1188, ¶ 2; Enbridge II , No. 2015AP1346, ¶ 4. In 1949, the Engelkings' predecessor in title executed a "Right of Way Grant" (hereinafter, the 1949 Grant) conveying to Enbridge's predecessor "a right of way and easement for the purpose of laying, maintaining, operating, patrolling (including aerial patrol), altering, repairing, renewing and removing in whole or in part a pipe line for the transportation of crude petroleum, its products and derivatives, whether liquid or gaseous, and/or mixtures thereof." Between 1949 and 1967, Enbridge's predecessor constructed three pipelines (Lines 1, 2, and 3) across what is now the Engelkings' property, pursuant to the 1949 Grant. Enbridge II , No. 2015AP1346, ¶ 6. Enbridge constructed a fourth pipeline (Line 4) in 2002 and built two additional pipelines (Lines 5 and 6) in 2009. Id. , ¶ 8.
¶ 4 In July 2010, Enbridge filed suit against the Engelkings, alleging they had breached the terms of the 1949 Grant. Id. In response, the Engelkings filed numerous counterclaims against Enbridge. Enbridge I , No. 2012AP1188, ¶ 5. As relevant here, the Engelkings asserted trespass and ejectment counterclaims, based on allegations that Enbridge had constructed Lines 4, 5, and 6 outside the right-of-way created by the 1949 Grant. The circuit court dismissed the Engelkings' trespass and ejectment counterclaims, id. , ¶ 6, but we reversed those rulings in Enbridge I and remanded for further proceedings, id. , ¶ 1.
¶ 5 On remand, the circuit court chose to submit certain factual questions to an advisory jury. Enbridge II , No. 2015AP1346, ¶ 13. The jury ultimately found that the right-of-way over the Engelkings' property extended twenty-five feet on either side of Line 1. Id. , ¶ 15. The jury further found that the presence of Lines 4, 5, and 6 constituted a trespass on the Engelkings' property, and it awarded the Engelkings $150,000 in damages for the trespass. Id. , ¶ 17. However, the jury rejected the Engelkings' ejectment counterclaim, finding that Enbridge should not be required to remove Lines 4, 5, and 6. Id. The circuit court entered judgment on the jury's verdict, and both parties appealed. Id. , ¶¶ 18, 23-25. We affirmed the circuit court's judgment in all respects in Enbridge II . Id. , ¶ 3.
¶ 6 On June 29, 2015, while the Enbridge II appeal was pending, the Engelkings filed a separate lawsuit against Enbridge, which is the subject of this appeal. In their complaint, the Engelkings advanced two categories of claims. First, they asserted trespass and unjust enrichment claims based on the continued presence of Lines 4, 5, and 6 on their property (hereinafter, the future damages claims). Second, they asserted claims for breach of contract, trespass, declaratory judgment, and unjust enrichment, all on the grounds that Enbridge had violated the 1949 Grant by using Line 1 to transport natural gas liquids (NGLs) across their property (hereinafter, the Line 1 claims).
¶ 7 Enbridge moved to dismiss the Engelkings' complaint, arguing their claims were barred by the final judgment in the 2010 lawsuit, pursuant to the doctrine of claim preclusion and the common-law compulsory counterclaim rule. On September 10, 2015, the circuit court stayed proceedings on the Engelkings' claims, pending a decision from this court in Enbridge II . We issued that decision on October 25, 2016. See Enbridge II , No. 2015AP1346. During a subsequent hearing in the instant case on July 10, 2017, the circuit court granted Enbridge's motion to dismiss the Engelkings' future damages claims, concluding they were barred by the doctrine of claim preclusion. The court denied Enbridge's motion to dismiss the Line 1 claims.
¶ 8 Enbridge filed an answer as to the Line 1 claims on July 20, 2017. Seventy-five days later, on October 3, Enbridge moved for summary judgment on the Line 1 claims. Enbridge argued those claims failed, as a matter of law, because NGLs are derivatives of crude petroleum, and the 1949 Grant therefore permits Enbridge to transport them across the Engelkings' property. In support of this argument, Enbridge relied on an affidavit submitted by Ashok Anand, a chemical engineer and Enbridge employee. Anand averred, based on his education, training, and experience, that the NGLs Enbridge transports across the Engelkings' property "clearly are products or derivatives of crude petroleum." He explained:
The components of the NGL stream [transported through Line 1] can be derived from different sources, including one, all or any combination of the following production facilities: (a) crude oil production; (b) natural gas plants; and (c) crude oil refineries. Moreover, NGLs such as propane, butane and pentane plus that result from production of natural gas wells can be commingled with crude oil, and, as such, are considered part of crude petroleum, or they can [be] separated in gas plants and marketed as distinct components without being mixed with crude oil. Alternately, when crude oil is refined to produce various products such as gasoline, diesel, and jet fuel, the above components (propane, butanes, pentane plus) which are part of the crude oil are also produced and need to be transported to markets.
¶ 9 Anand further averred that, regardless of the "specific makeup" of the NGLs Enbridge transports, "as a matter of chemistry, [they] all are products or derivatives of crude petroleum which has been subject to mixing, processing, refining, pressurization or heating to reach the NGL form." Anand also opined that, at the time the 1949 Grant was drafted, "the term 'crude petroleum' was used generically to describe all of the hydrocarbons derived from oil and gas wells."
¶ 10 The Engelkings filed a brief in opposition to Enbridge's summary judgment motion on October 20, 2017. They argued Enbridge had failed to make a prima facie case for summary judgment because Anand's opinion regarding the oil and gas industry's use of the term "crude petroleum" in 1949 was unsupported by proper foundation. They also submitted various documents, which they asserted raised a genuine issue of material fact as to whether NGLs were considered to be crude petroleum derivatives in 1949. They did not, however, submit any expert affidavits in support of their position. The Engelkings also argued, in the alternative, that summary judgment was inappropriate because they had not yet had the opportunity to conduct discovery. They therefore asked the circuit court to stay Enbridge's summary judgment motion and provide them with "a reasonable opportunity to conduct discovery to support their claims."
¶ 11 The circuit court orally granted Enbridge's summary judgment motion during a hearing on October 27, 2017. The court declined to stay proceedings on the motion in order to allow the Engelkings to conduct discovery, stating the Engelkings had not "flushed out" their argument regarding the need for additional discovery. The court also questioned why the Engelkings' attorney, who was himself a chemical engineer, could not have submitted an affidavit disputing Anand's opinion.
¶ 12 Addressing the merits of the summary judgment motion, the circuit court concluded the 1949 Grant was unambiguous, and the term "crude petroleum, its products and derivatives" was "intentionally broad" in order to allow Enbridge to transport a variety of products through its pipelines. The court then relied on Anand's affidavit for the proposition that NGLs fall within the term "crude petroleum, its products and derivatives," and the court observed that the Engelkings had failed to submit an expert affidavit contradicting Anand's opinion. The court explained, "I think if I had had a counter-affidavit ... we would be in a different place." Lacking such an affidavit, however, the court concluded there were no genuine issues of material fact, and the 1949 Grant unambiguously permitted Enbridge to transport NGLs through the pipelines on the Engelkings' property. The court therefore entered a written judgment dismissing the Line 1 claims, and the Engelkings now appeal.
DISCUSSION
I. The future damages claims
¶ 13 As noted above, the circuit court granted Enbridge's motion to dismiss the Engelkings' future damages claims on the grounds that they were barred by the doctrine of claim preclusion. "We review the grant of a motion to dismiss based upon claim preclusion in the same manner we review a grant of summary judgment." Wisconsin Pub. Serv. Corp. v. Arby Constr., Inc. , 2012 WI 87, ¶ 28, 342 Wis. 2d 544, 818 N.W.2d 863. Thus, we independently review the circuit court's decision to dismiss the Engelkings' future damages claims, applying the same methodology as the circuit court. See id. , ¶ 29. Whether claim preclusion applies under a given factual scenario is a question of law that we review independently. Id. , ¶ 30.
¶ 14 The doctrine of claim preclusion provides that a final judgment "is conclusive in all subsequent actions between the same parties as to all matters which were litigated or which might have been litigated in the former proceeding." Id. , ¶ 33 (citation omitted). Three elements must be present for claim preclusion to apply: "(1) an identity between the parties or their privies in the prior and present suits; (2) an identity between the causes of action in the two suits; and, (3) a final judgment on the merits in a court of competent jurisdiction." Id. , ¶ 35 (citation omitted).
¶ 15 In this case, the Engelkings concede that there is an identity between the parties in the present action and those in the 2010 lawsuit. In addition, they do not dispute that the 2010 lawsuit resulted in a final judgment on the merits in a court of competent jurisdiction. Accordingly, the only disputed issue is whether there is an identity between the future damages claims in the instant case and the Engelkings' counterclaims in the 2010 lawsuit.
¶ 16 To determine whether an identity of claims exists, we apply the "transactional approach" from the RESTATEMENT (SECOND) OF JUDGMENTS § 24 ( AM. LAW INST. 1982) (hereinafter, RESTATEMENT ). Menard, Inc. v. Liteway Lighting Prods. , 2005 WI 98, ¶ 30, 282 Wis. 2d 582, 698 N.W.2d 738.
"Under this analysis, all claims arising out of one transaction or factual situation are treated as being part of a single cause of action and they are required to be litigated together." The concept of a transaction, "connotes a natural grouping or common nucleus of operative facts." In determining if the claims of an action arise from a single transaction, we may consider whether the facts are related in time, space, origin, or motivation.
Id. (citations omitted).
¶ 17 Here, the identity-of-claims requirement is clearly satisfied. Not only do the Engelkings' future damages claims arise out of the same transaction or factual situation as their counterclaims in the 2010 lawsuit, the Engelkings are asserting the very same claims in this case that they advanced in the prior suit. The Engelkings' complaint in this case alleges that Lines 4, 5, and 6 are located outside the right-of-way conveyed by the 1949 Grant and therefore constitute an "ongoing trespass" upon the Engelkings' property. As a result, the Engelkings assert they are entitled to recover monetary damages for trespass and unjust enrichment. In the 2010 lawsuit, the Engelkings similarly sought monetary damages for trespass and unjust enrichment based on the unlawful presence of Lines 4, 5, and 6 on their property.
¶ 18 The Engelkings argue their claims here are distinct from the counterclaims they advanced in the 2010 lawsuit because they previously sought only past damages and ejectment as remedies. They contend that, in the present lawsuit, they are instead seeking damages for the "ongoing/future post-verdict trespass." They assert the issue of future damages "was not raised before or adjudicated by the [c]ourt in the 2010 [a]ction."
¶ 19 The record, however, does not support the Engelkings' claim that future damages were not raised or adjudicated in the 2010 lawsuit. To the contrary, the record shows that, when instructing the jury in the 2010 case, the circuit court stated:
Determining damages for trespass cannot always be made exactly or with mathematical precision; you should award as damages amounts which will fairly compensate the Engelkings for their injuries.
....
In computing the amount of future economic damages, you may take into account economic conditions, past, present ... and future and ... the effects of inflation.
¶ 20 The special verdict form, in turn, asked the jury to determine what amount of money would "fairly and adequately compensate the Engelkings for the lost use of their land due to [Enbridge's] trespass caused by the presence of [Lines 4, 5, and 6] on the Engelking[s'] property." It did not instruct the jury to limit its award to past damages. The verdict form also addressed the Engelkings' ejectment claim, asking whether Enbridge "[s]hould ... be required to remove [Lines 4, 5, and 6] from the Engelkings' property." The jury in the 2010 case found that the presence of Lines 4, 5, and 6 on the Engelkings' property constituted a trespass, but it rejected the Engelkings' ejectment claim and instead awarded them $150,000 in damages. Under these circumstances, it is clear that the issue of future damages was, in fact, raised and adjudicated in the 2010 lawsuit.
¶ 21 In arguing to the contrary, the Engelkings cite statements the circuit court apparently made during a hearing on postverdict motions in the 2010 case.[1] Enbridge had filed a postverdict motion asking the court to declare that the jury's verdict would bar the Engelkings from making subsequent claims based on Enbridge's continuing trespass on their property. See Enbridge II , No. 2015AP1346, ¶ 70 n.13. The court denied Enbridge's motion, stating, in part, that the jury in the 2010 case was "just asked for the damages up to 2014" and "was only to determine [trespass damages] up to the date of the trial." The Engelkings argue these statements show that the 2010 lawsuit did not address the issue of future damages.
¶ 22 We reject the Engelkings' argument on this point for two reasons. First, Enbridge asserts-and the Engelkings do not dispute-that the circuit court made the statements in question without the benefit of a trial transcript. As noted above, the trial transcript shows that the jury in the 2010 case was instructed regarding an award of future damages.
¶ 23 Second, during a hearing in the instant case on Enbridge's motion to dismiss the future damages claims, the same circuit court judge who presided over the 2010 lawsuit concluded, contrary to his prior statements, that the Engelkings had sought future damages in the 2010 case. The court explained:
I think, in this circumstance, both the jury verdict and the jury instructions, looking at those now back and having a chance to review all of the information, the jury was instructed to consider future. And the question, in general, what amount of money will fairly and accurately compensate the Engelkings for the lost use of their land due to [Enbridge's] trespass caused by the presence of [Lines 4, 5, and 6] on the Engelking property. And they answered that question. It didn't say up for a certain period of time. It didn't limit the amount. It was a general damages question that we sometimes have in personal injury cases or other cases.
....
I mean, it's a clear example of claim preclusion. That's something that was asked for and, in this case, the plaintiffs in their-in their case, had the ability to ask for it. They chose not to or, in my opinion, the jury was instructed on it. So it was-in my opinion, it included all of the damages for the future, now taking a look at hindsight being 20/20 in looking at all the facts and circumstances.
As the above excerpt shows, with the benefit of both hindsight and a trial transcript, the circuit court concluded the issue of future damages was, in fact, raised and adjudicated in the 2010 lawsuit.
¶ 24 The Engelkings nevertheless argue that the damages award in the 2010 case must not have included any amount for future damages because the question regarding damages on the special verdict form was located before the questions regarding ejectment. The Engelkings therefore assert the jury "was asked to calculate damages for trespass before considering whether ejectment was warranted." They argue, "If future damages were before the jury in [the 2010 case], then they should have been asked to decide future damages only after denying ejectment-which did not occur ."
¶ 25 We are not persuaded. The jury's answers to the verdict questions on ejectment were not contingent on its answer to the damages question. Rather, the jury was instructed to answer the ejectment questions if it found that Enbridge had trespassed on the Engelkings' property. Having made that finding, the jury could have rejected the Engelkings' ejectment claim and awarded future damages for the trespass according to the circuit court's instruction,[2] regardless of the relative locations of the verdict questions regarding damages and ejectment. In other words, the mere fact that the damages question was located before the ejectment questions did not prevent the jury from awarding future damages as a component of its overall damages award.
¶ 26 The Engelkings also argue that claim preclusion is inapplicable here because "[e]ach instance of a continuing trespass creates a new cause of action." In support of this argument, they rely on Enbridge I , as well as three Wisconsin Supreme Court cases: Kull v. Sears, Roebuck & Co. , 49 Wis. 2d 1, 181 N.W.2d 393 (1970) ; Speth v. City of Madison , 248 Wis. 492, 22 N.W.2d 501 (1946) ; and Ramsdale v. Foote , 55 Wis. 557, 13 N.W. 557 (1882). However, none of these cases discussed whether each instance of a continuing trespass constitutes a new transaction for purposes of claim preclusion . Instead, Speth , Ramsdale , and Enbridge I addressed whether the statute of limitations bars an action for a continuing injury when the initial instance of injury occurred outside the limitations period. See Speth , 248 Wis. at 499 ; Ramsdale , 55 Wis. at 562 ; Enbridge I , No. 2012AP1188, ¶¶ 16-17. In Kull , the court merely quoted Ramsdale for the proposition that "every continuance of a nuisance is, in law, a new nuisance." Kull , 49 Wis. 2d at 9.
¶ 27 The Engelkings also rely on an 1879 case, in which our supreme court observed that a landowner's recovery of damages for a railroad's continuing trespass would not bar another trespass action by the same landowner to recover damages sustained following the first lawsuit. Carl v. Sheboygan & Fond du Lac R.R. Co. , 46 Wis. 625, 629, 1 N.W. 295 (1879). Carl is not controlling, however, because it was decided before Wisconsin adopted the transactional approach to claim preclusion. The Engelkings' reliance on Lawlor v. National Screen Service Corp. , 349 U.S. 322 (1955), is also misplaced because the Court there "held only that a prior judgment could not extinguish claims that did not even exist at the time of the judgment and thus could not possibly have been sued upon at that time." Juneau Square Corp. v. First Wis. Nat'l Bank of Milwaukee , 122 Wis. 2d 673, 683, 364 N.W.2d 164 (Ct. App. 1985) (discussing Lawlor ). Here, all of the material facts supporting the Engelkings' future damages claims existed at the time they filed the 2010 lawsuit.
¶ 28 The Engelkings next argue that, even if the elements of claim preclusion are satisfied, three exceptions to the doctrine apply. First, the Engelkings argue claim preclusion is inapplicable here because the circuit court in the 2010 lawsuit "expressly reserved [the Engelkings'] right to maintain the second action." See RESTATEMENT § 26(1)(b). In support of this assertion, the Engelkings again rely on the circuit court's statements during the postverdict hearing in the 2010 lawsuit that the jury was "just asked for the damages up to 2014" and "was only to determine [trespass damages] up to the date of the trial."
¶ 29 We do not agree that these statements were sufficient to "reserve" the Engelkings' right to maintain a second action for Enbridge's continuing trespass. First, the alleged reservation was not reduced to writing, and an oral reservation is generally insufficient to satisfy the exception in RESTATEMENT § 26(1)(b). See Chellappa v. Summerdale Court Condo. Assoc. , 729 F. App'x 451, 454 (7th Cir. 2018). Second, although the circuit court in the 2010 lawsuit denied Enbridge's motion for a declaration that the jury's verdict barred additional trespass claims, the court did not affirmatively rule that such claims would be permitted. See Enbridge II , No. 2015AP1346, ¶ 70 n.13. Third, the same judge who ruled on the postverdict motions in the 2010 action later reversed course and concluded the verdict in that case did encompass future damages. We therefore reject the Engelkings' argument that claim preclusion does not apply, pursuant to the exception in RESTATEMENT § 26(1)(b).
¶ 30 The Engelkings next rely on an exception providing that claim preclusion does not apply where, "in a case involving a continuing or recurrent wrong, the plaintiff is given an option to sue once for the total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit, and chooses the latter course." See RESTATEMENT § 26(1)(e). The Engelkings contend they "chose in the prior lawsuit to sue only for damages to the date of suit, and therefore should be permitted to pursue another suit for the ongoing trespass." In response, however, Enbridge observes that the exception in RESTATEMENT § 26(1)(e) only applies where the plaintiff was "given the option" to sue either once or from time to time. Enbridge asserts this "option" must be granted to the plaintiff by the court in the first action. Enbridge further contends that, in the 2010 action, "the Engelkings did not request and the court did not give them the option to bring successive actions for damages based on the presence of Lines 4, 5, and 6." The Engelkings do not respond to this argument, and we therefore deem it conceded. See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp. , 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).
¶ 31 Finally, the Engelkings rely on an exception stating that claim preclusion does not apply when
[i]t is clearly and convincingly shown that the policies favoring preclusion of a second action are overcome for an extraordinary reason, such as the apparent invalidity of a continuing restraint or condition having a vital relation to personal liberty or the failure of the prior litigation to yield a coherent disposition of the controversy.
RESTATEMENT § 26(1)(f). The Engelkings argue this exception applies because they "were not awarded future trespass damages" in the 2010 lawsuit and, as such, that lawsuit "failed to provide a complete disposition of the controversy, leaving the parties in a state of ongoing and recurrent wrong." We have already concluded, however, that the issue of future damages was raised and adjudicated in the 2010 action. The Engelkings' argument that the 2010 action failed to provide a "complete disposition of the controversy" is therefore unpersuasive.
¶ 32 For all of the foregoing reasons, we agree with Enbridge that the judgment in the 2010 lawsuit precludes the Engelkings' future damages claims in the instant case. Accordingly, the circuit court properly granted Enbridge's motion to dismiss those claims.[3]
II. The Line 1 claims
¶ 33 The Engelkings next argue that the circuit court erred by granting Enbridge summary judgment on their Line 1 claims. They contend, in the first place, that the court should have stayed Enbridge's motion in order to give them additional time to conduct discovery. They rely on WIS. STAT. § 802.08(4) (2015-16),[4] which states:
Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the motion for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
¶ 34 Whether to grant a continuance under WIS. STAT. § 802.08(4) in order to permit a party to conduct discovery is a "highly discretionary ruling." Kinnick v. Schierl, Inc. , 197 Wis. 2d 855, 865, 541 N.W.2d 803 (Ct. App. 1995). We will affirm the circuit court's decision as long as it applied the correct law to the facts of record and reached a reasonable result. Jorgensen v. Water Works, Inc. , 218 Wis. 2d 761, 772, 582 N.W.2d 98 (Ct. App. 1998). Although a circuit court should explain the basis for its exercise of discretion on the record, where it fails to do so, we will nevertheless affirm if we "can find facts of record which would support the circuit court's decision." Peplinski v. Fobe's Roofing, Inc. , 193 Wis. 2d 6, 20, 531 N.W.2d 597 (1995).
¶ 35 In this case, we conclude for two reasons that the circuit court properly exercised its discretion by refusing to grant the Engelkings additional time to conduct discovery. First, by its plain language, WIS. STAT. § 802.08(4) requires a party seeking a continuance to state, in affidavit form, why it cannot present facts essential to justify its opposition to the summary judgment motion. Van Straten v. Milwaukee Journal Newspaper-Publisher , 151 Wis. 2d 905, 919-20, 447 N.W.2d 105 (Ct. App. 1989). The Engelkings did not file any affidavit in support of their request for additional time to conduct discovery. Their failure to do so provided a sufficient basis for the circuit court to deny their request.[5] ibr.US_Case_Law.Schema.Case_Body:v1">See id. at 920.
¶ 36 Second, while the Engelkings stress that Enbridge filed its summary judgment motion only seventy-five days after answering their complaint, their emphasis on that point ignores the greater factual context. Enbridge filed its summary judgment motion over two years after the Engelkings commenced this lawsuit. Although proceedings on the Engelkings' lawsuit were stayed pending our decision in Enbridge II , the stay did not preclude the Engelkings from gathering evidence or expert opinions to support their claims. It should not have come as a surprise to the Engelkings that they would be required to provide such evidence once the stay was lifted. Under these circumstances, the circuit court did not erroneously exercise its discretion by refusing to grant the Engelkings a continuance.
¶ 37 The Engelkings next argue that, even if the circuit court properly refused to grant them a continuance, the court nevertheless erred by granting Enbridge's summary judgment motion. We independently review a grant of summary judgment, using the same methodology as the circuit court. Hardy v. Hoefferle , 2007 WI App 264, ¶ 6, 306 Wis. 2d 513, 743 N.W.2d 843.
¶ 38 "Under that methodology, the court, trial or appellate, first examines the pleadings to determine whether claims have been stated and a material factual issue is presented." Preloznik v. City of Madison , 113 Wis. 2d 112, 116, 334 N.W.2d 580 (Ct. App. 1983). If so, we then examine the moving party's submissions to determine whether they establish a prima facie case for summary judgment. Id. If the moving party has made a prima facie showing, we examine the opposing party's affidavits to determine whether a genuine issue exists as to any material fact. Id. Ultimately, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).
¶ 39 In this case, neither party disputes that the Line 1 claims were properly stated in the Engelkings' complaint or that Enbridge's answer to those claims joined issue. We therefore proceed to the second step of the summary judgment analysis and consider whether Enbridge established a prima facie case for summary judgment. See Preloznik , 113 Wis. 2d at 116.
¶ 40 "A prima facie case is established ... when evidentiary facts are stated which[,] if they remain uncontradicted by the opposing party's affidavits[,] resolve all factual issues in the moving party's favor." Walter Kassuba, Inc. v. Bauch , 38 Wis. 2d 648, 655, 158 N.W.2d 387 (1968). Here, the relevant issue for purposes of Enbridge's summary judgment motion is whether the 1949 Grant permits Enbridge to transport NGLs across the Engelkings' property. As noted above, the 1949 Grant allows Enbridge to operate "a pipe line for the transportation of crude petroleum, its products and derivatives, whether liquid or gaseous, and/or mixtures thereof." In support of its summary judgment motion, Enbridge submitted the affidavit of chemical engineer Ashok Anand, who averred that the "NGLs transported in Line 1 clearly are products or derivatives of crude petroleum." This evidence, if uncontradicted, would be sufficient to establish that the 1949 Grant permits Enbridge to transport NGLs across the Engelkings' property. As such, Enbridge established a prima facie case for summary judgment on the Engelkings' Line 1 claims.
¶ 41 The Engelkings argue the circuit court erred in two ways by concluding Enbridge established a prima facie case for summary judgment. First, they argue the court erred by concluding the 1949 Grant was unambiguous, but nevertheless considering extrinsic evidence (i.e., Anand's affidavit) when interpreting it. The Engelkings argue extrinsic evidence cannot be used to interpret an unambiguous instrument. They further argue the 1949 Grant is ambiguous as to whether its drafters intended to permit the transportation of NGLs. Accordingly, they assert "a fact finder must review competing extrinsic evidence to establish the intent of the parties at the time the [1949 Grant] was created."
¶ 42 When interpreting a deed conveying an easement, a court's first step is to examine the language of the deed, which is the primary source of the parties' intent. Grygiel v. Monches Fish & Game Club, Inc. , 2010 WI 93, ¶ 20, 328 Wis. 2d 436, 787 N.W.2d 6. "If the language within the four corners of the deed is unambiguous, the court will not look further." Id. However, if the deed's language is ambiguous-that is, susceptible to more than one reasonable interpretation-the court may examine extrinsic evidence in an effort to determine the parties' intent. Id. Whether a deed is ambiguous is a question of law that we review independently. Gojmerac v. Mahn , 2002 WI App 22, ¶ 24, 250 Wis. 2d 1, 640 N.W.2d 178.
¶ 43 Here, we agree with the circuit court that the 1949 Grant is unambiguous. The meaning of the relevant language within the deed is clear: Enbridge may operate pipelines across the Engelkings' property for the transportation of "crude petroleum, its products and derivatives." Based on this broad, unambiguous language, it is clear the parties to the 1949 Grant intended to permit the transportation of all crude petroleum products and derivatives. The only question is whether NGLs are, in fact, products or derivatives of crude petroleum. Anand's affidavit is directly relevant to that issue, and the court therefore properly considered his opinions in applying the unambiguous deed language.
¶ 44 The Engelkings also argue Enbridge failed to make a prima facie case for summary judgment because Anand's opinion regarding the oil and gas industry's use of the term "crude petroleum" in 1949 is "without foundation and should have been disregarded." As noted above, Anand averred that the term crude petroleum "was used generically" in 1949 "to describe all of the hydrocarbons derived from oil and gas wells." The Engelkings argue Anand's affidavit does not demonstrate an appropriate foundation for that opinion because it does not show either: (1) that Anand had personal experience with the oil and gas industry in 1949; or (2) that he conducted sufficient research and review of industry information from 1949 to provide a basis for his opinion.
¶ 45 The Engelkings' argument in this regard misses the point. The relevant issue, for purposes of Enbridge's summary judgment motion, is not how the term crude petroleum was used or understood in 1949. The issue is whether NGLs are, in fact, products or derivatives of crude petroleum. As the circuit court aptly noted, the phrase "crude petroleum, its products and derivatives" is "intentionally broad." The use of that broad term unambiguously demonstrates that the parties to the 1949 Grant intended to allow the transportation of all products and derivatives of crude petroleum through the pipelines on the Engelkings' property. Regardless of whether the original contracting parties understood, at the time of signing, that NGLs were products or derivatives of crude petroleum, Anand's expert opinion as a chemical engineer indicates that they are. That opinion, in and of itself, is sufficient to support a prima facie case for summary judgment on the Engelkings' Line 1 claims.
¶ 46 The Engelkings next argue that, even if Enbridge made a prima facie case for summary judgment, their own evidentiary submissions were sufficient to raise genuine issues of material fact as to whether the 1949 Grant permits the transportation of NGLs. First, the Engelkings argue case law supports a conclusion that NGLs are "separate and distinct from crude petroleum, its products and derivatives." However, the only case they cite in support of this proposition is a federal district court opinion, which is not binding on this court. See State v. Wood , 2010 WI 17, ¶ 18, 323 Wis. 2d 321, 780 N.W.2d 63.
¶ 47 Moreover, the single case the Engelkings cite does not actually support their position. In that case, Mobil Oil sought a declaratory judgment that the federal government lacked authority to regulate natural gas products, despite statutory authority permitting the regulation of "refined petroleum product[s]," which were statutorily defined to include the natural gas products propane and butane. Mobil Oil Corp. v. Federal Energy Admin. , 435 F. Supp. 983, 985, 987 (N.D. Tex. 1977). In support of its position, Mobil Oil asserted the oil and gas industry did not use the term refined petroleum products "to include natural gas liquids." Id. at 985. The court observed that the government did not appear to contest Mobil Oil's assertion regarding industry usage. Id. Consequently, the court did not conclusively decide whether the oil and gas industry used the term refined petroleum products to include NGLs; it merely accepted Mobil Oil's allegation regarding industry usage as true based on the government's failure to dispute it. Id. Furthermore, the court ultimately concluded that the term refined petroleum products, as used in the relevant statute, did permit the government to regulate certain NGLs. Id. at 995. As such, Mobil Oil fails to support the Engelkings' position that NGLs cannot be considered products or derivatives of crude petroleum.[6]
¶ 48 The Engelkings next assert, in a general fashion, that multiple United States government publications contradict Anand's assertion that NGLs constitute crude petroleum products or derivatives. However, the Engelkings develop a specific argument regarding only one of those publications-a "Minerals Yearbook" for the year 1949 published by the United States Department of the Interior, Bureau of Mines. They assert the Minerals Yearbook shows that, "in 1949, the oil and gas industry treated NGL as a separate and distinct product that was derived from natural gas, rather than crude petroleum."
¶ 49 We do not find this argument persuasive. Although the Minerals Yearbook contains separate chapters pertaining to "Natural Gas," "Natural Gasoline and Liquefied Petroleum Gases," and "Petroleum and Petroleum Products," the Engelkings do not point to anything in the Minerals Yearbook actually stating that NGLs cannot be derived from crude petroleum or that NGLs do not constitute products or derivatives of crude petroleum. As such, the Minerals Yearbook does not contradict Anand's expert opinion that NGLs are, in fact, products or derivatives of crude petroleum.
¶ 50 Finally, the Engelkings argue Enbridge's own "[h]istorical recitations" create a genuine issue of material fact as to whether the 1949 Grant permits the transportation of NGLs. First, they cite "online documents," which they contend show that "Enbridge and its predecessor did not begin transporting NGL until the 1970s at the earliest." They therefore argue it is "improbable that the drafters of the [1949 Grant] contemplated the transport of NGLs on [the Engelkings'] property." This argument is unavailing because, as noted above, the 1949 Grant was broadly drafted to permit the transportation of all products and derivatives of crude petroleum. The parties to the 1949 Grant could have specified particular crude petroleum products or derivatives whose transport was permitted, but they chose not to do so. As such, the fact that Enbridge and its predecessor did not begin transporting NGLs until the 1970s is irrelevant.
¶ 51 The Engelkings also cite an "Enbridge Income Fund Annual Information Form" for the year 2015, which defines "NGL" to mean "natural gas liquids which are comprised of ethane, propane, normal butane, isobutene and pentanes plus, or any of them, or any mixture of any of them, and includes any substances that may be incidentally recovered therewith on extraction from natural gas ." (Emphasis added.) While this definition states NGLs include substances that may be recovered on extraction from natural gas, it does not state that NGLs cannot also be derived from crude petroleum. Accordingly, it does not contradict Anand's expert opinion in that regard. Moreover, the applicability of the cited definition is expressly limited to the Annual Information Form in which it appears.[7]
¶ 52 In summary, we conclude the circuit court did not erroneously exercise its discretion by denying the Engelkings' request for additional time to conduct discovery on Enbridge's Line 1 claims. We further conclude Enbridge made a prima facie case for summary judgment on those claims, and, in response, the Engelkings failed to demonstrate the existence of a genuine issue of material fact that would preclude summary judgment. Accordingly, the circuit court properly granted Enbridge summary judgment on the Engelkings' Line 1 claims.
By the Court. -Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

The Engelkings do not cite to the transcript of the hearing in question. Instead, they cite to their circuit court brief in opposition to Enbridge's motion to dismiss, which purports to provide quotations from the relevant hearing. Circuit court briefs are not evidence and therefore may not be cited on appeal to support a party's factual allegations. See State v. Bean , 2011 WI App 129, ¶ 24 n.5, 337 Wis. 2d 406, 804 N.W.2d 696. Nevertheless, Enbridge does not dispute that the quotations in the Engelkings' brief accurately reflect what occurred during the postverdict hearing in the 2010 case.

We presume that jurors follow the court's instructions. See State v. Truax , 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989).

In their brief-in-chief, the Engelkings suggest that claim preclusion, by itself, cannot bar their future damages claims absent operation of the common-law compulsory counterclaim rule. We disagree. When discussing the common-law compulsory counterclaim rule, our supreme court has explained that "[c]laim preclusion, standing alone , is not a bar to a subsequent suit by a defendant who chooses not to counterclaim in the first action ." Wickenhauser v. Lehtinen , 2007 WI 82, ¶ 23, 302 Wis. 2d 41, 734 N.W.2d 855 (first emphasis in Wickenhauser ; second emphasis added). Here, as discussed above, the Engelkings chose to assert counterclaims in the 2010 action that are identical to the future damages claims they have asserted in the instant case. An analysis under the common-law compulsory counterclaim rule is therefore unnecessary.
In addition, we note the Engelkings also argue in their brief-in-chief that the election of remedies doctrine does not preclude their future damages claims. We need not address this argument because we conclude the future damages claims are otherwise barred by the doctrine of claim preclusion. See Turner v. Taylor , 2003 WI App 256, ¶ 1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (court of appeals need not address all issues raised by the parties if one is dispositive).

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

In their reply brief, the Engelkings argue requiring an affidavit would elevate form over substance, as their brief in opposition to summary judgment "discussed at length ... that they hadn't conducted discovery and needed a continuance to provide evidence to oppose summary judgment, beyond publicly available reference material." However, their brief did not describe what action they had already taken to try to get the information they claimed was necessary, how they would obtain that information if granted a continuance, or how long it would take them to obtain the information. Their brief therefore contained insufficient information for the circuit court to assess their request for a continuance.

In addition, the Mobil Oil court observed that the NGLs propane and butane "may be refined from crude oil in an oil refinery or they may be recovered from processing natural gas by fractionating a mechanical means." Mobil Oil Co. v. Federal Energy Admin. , 435 F. Supp. 983, 986 (N.D. Tex. 1977). This statement is consistent with the averments in Anand's affidavit.

In addition to the Annual Information Form and "online documents" discussed above, the Engelkings assert that "[t]hroughout Enbridge's corporate disclosures and records, NGL is consistently referenced as a distinct product unto itself." The Engelkings do not, however, provide any record citations in support of this assertion, and we therefore will not consider it. A reviewing court "need not sift the record for facts which support counsel's contention." Siva Truck Leasing, Inc. v. Kurman Distribs. , 166 Wis. 2d 58, 70 n.32, 479 N.W.2d 542 (Ct. App. 1991).